## Case No. 5,674.

GRAHAM v. PENNSYLVANIA INS. CO.

[2 Wash. C. C. 113.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1807.

INSURANCE—PRIZE—CONSTRUCTION OF TREATY—
EVIDENCE—INVOICE.

1. Insurance on goods on board the Concord, at and from her port or ports, place and places of loading in Honduras, to Liverpool; warranted free from loss in consequence of, or detention on account of, any illicit or prohibited trade. The vessel was captured in the Bay of Honduras, by a British vessel, as prize; on the allegation that she was taking on board mahogany of larger dimensions than was allowed to American vessels; and while on her passage to Jamaica, she, with the capturing vessel, was lost.

2. Privileges given to vessels to cut mahogany, under the treaties between Spain and England, of 1762 and 1783. What is the proper construction of those treaties, and of the proclamations and laws relative to the trade under them, which have been issued or ordained by the English government.

3. It is no objection to giving in evidence a bill of loading and invoice, which have been made out after the usual and regular time, if the circumstances under which the vessel and master were, prevented their being made out at the common period.

4. The invoice of the cargo is, against the general principles of evidence, uniformly admitted as prima facie evidence of the value of the cargo; and no more. It is not necessary to show its correspondence with the books of the party producing it.

This was an action upon an open policy, dated the 16th of February, 1805, underwritten by defendants for 10,000 dollars, on goods on board the Concord, at and from her port or ports, place or places of loading, in Honduras, to Liverpool; warranted by the assured free from any charge, damage, or loss, which may arise in consequence of a seizure or detention of the property, for or on account of any illicit or prohibited trade. The insurance was declared to be on mahogany and dye-woods. The vessel was American, chartered in Philadelphia, in September, 1804, for this voyage, by the plaintiff, a British subject, resident within the limits of the British settlement in Honduras. She arrived at Honduras in November, 1804, and proceeded to Bellize, within the British settlement, where she took in a quantity of logwood, and then fell down to the Rio Grande, without the English limits, and within those of Spain, carrying a sworn measurer from the Bellize; and there took in more than half her load of mahogany, which generally exceeded twenty inches diameter, in its largest dimensions. Before she had completely taken in her load of mahogany, and whilst engaged in doing so, she was, on the 27th of January, 1805, captured by a British vessel, as prize; the alleged reason

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

was, that she had on board mahogany of a larger size than was permitted to be exported by the regulations of the British settlement at Honduras. After the seizure, there being a part of the mahogany alongside for completing of the loading, it was taken in, by permission of the captor. The prize was first carried to Bellize, and thence proceeded with the capturing vessel to Jamaica; but on her passage thither, both vessels were lost on the Florida coast, on the 6th of March, 1805.

Some evidence was given of a usage for the settlers within the British part of Honduras, to cut and export mahogany from the Spanish territory, sending cutters and sworn measurers to aid in the business. When the Concord first left the Bellize, she received, from the superintendent there, a clearance for the logwood, and for a blank number of feet of mahogany, (for at that time she had none on board;) with a permit to carry the same to Liverpool; and a certificate, that bond had been given by the said Graham that he was a British subject, and would carry his said cargo to Liverpool, and not land it in the United States. By the treaty of 1762, between Spain and England, the former ceded to the latter the right of cutting and exporting logwood from a certain district of country on the Bay of Honduras; and, by the treaty of 1783, the limits of this settlement are fixed, extending from Rio Hondo on the north, and Sibor on the south, including the Bellize within those limits. The convention of 1786, between these powers, extends the privileges before granted to the cutting of all other woods within that settlement, and gathering the natural fruits of the earth; but not to the cultivation of the land, or the erecting of manufactories. The treaty of 1783, contained an express reservation of the sovereignty of Spain over this territory; and the convention of 1786 stipulates, when wood should become scarce within the British settlement, that the settlers may cut it without their limits, paying a just price therefor.

The government of the British settlements is vested in a superintendent, appointed by the crown, who appears to unite legislative, judicial, and executive powers within the same; but who acts under instructions from the king in council, previously given, or by his approbation, afterwards given, to his acts. On the 14th of July, 1804, the superintendent issued his proclamation, reciting that mahogany exported from that settlement to America, is limited, by instructions of his majesty, to seventeen inches diameter, and that an application had been made to him, by the magistrates of the settlement, and a committee, to extend the permission to the diameter of twenty inches. He therefore declares, that all vessels trading from any place in the Bay of Honduras, where British settlers are permitted to cut mahogany, to any part of the United States, may take on board

and carry away mahogany, not exceeding twenty inches; such vessels coming to, and clearing out from the Bellize, and the owner or consignee entering into bond, not to cut or carry away any mahogany to the United States, exceeding the size thereby allowed. On the 11th of October, 1804, the superintendent issued a second proclamation, reciting, that by his former proclamation of the 14th of July, mahogany, not more than twenty inches, was permitted to be shipped on board American or foreign bottoms, which permission had been highly disapproved by the commander-in-chief of Jamaica and its dependencies; therefore it is ordered, that mahogany, measuring more than seventeen inches, will not be permitted to be exported from this settlement in any American or foreign vessel.

It appeared by the depositions of a number of witnesses, then resident in the British limits of Honduras, and who had long resided there, that they knew and had heard of no act of parliament, orders or instructions of the British government, forbidding the exportation of mahogany of any size from that settlement to Great Britain; and many of them stated, that such were their situations, that had any such ever issued, they must have known it; and that in that trade, and in this respect, they knew of no difference between British and foreign vessels.

The right of the plaintiff to recover, was opposed upon two grounds: first, that the warranty was not complied with; and secondly, that a deviation was committed. On the first, it was argued, that though in fact the mahogany, the article prohibited on account of its size, was taken in without the British limits, yet the vessel, having received her regular clearances and permit from the superintendent of the settlement, and having given bond to carry it to Liverpool, it must be considered as an exportation from that settlement, by a British subject, resident there. If so, it was clearly prohibited by the general and unqualified expressions of the second proclamation; which interdicts the exportation of mahogany, above seventeen inches, from that settlement, in foreign vessels. But, even if the exportation should not be considered as from that settlement, the having on board papers to show that this was the fact, was as much a breach of the warranty, as if the fact had been so. It would equally have led to a condemnation. If the trade was prohibited, the license of the superintendent and the clearance at Bellize, will not legitimate the transaction; since no part of the mahogany was on board when these papers were made out; and it is to be presumed, that when the wood should be taken in, it was to be of the size permitted to be exported.

Secondly, there was a deviation. On this point it was insisted, that from the circumstance of the insured being a British sub-

ject, resident in the British settlement at Honduras, who could not legally trade with the enemies of his country; (for on the 11th of January, 1805, war was declared by England against Spain,) and if there had not been war, who was prevented by the treaties subsisting between those powers, from cutting wood without the British settlement; it must have been understood between the plaintiff and defendants, when this policy was made out, that the risk was to commence from the loading of the vessel at a port in the British settlement in Honduras, and not Honduras generally, as expressed in the policy.

Thirdly, it was contended that the defendants, at all events, are not liable to pay for the mahogany taken in after the capture. It was answered by the counsel for the plaintiff, first, that if the exportation had been from the British settlement at Honduras, yet there was no law or proclamation which forbid foreign vessels from carrying mahogany of any size to England. The policy of the British government, which was to procure for the mother country the best wood, whilst that of inferior quality was allowed to be transported to other nations, will throw light upon the construction of the proclamations. The first is confined, exclusively, to mahogany, to be exported to the United States in any vessel. It was this permission which was disapproved by the commander-in-chief at Jamaica, and it was on this account that the second proclamation was issued, reducing the size to seventeen inches, as it stood before the first was issued. The second proclamation, then, ought to be construed so as merely to operate as a repeal of the first, and not to be more extensive than it. Upon the second point, they relied upon the words of the policy, which extend to every part of Honduras, and which cannot be restricted now. Third; it was insisted that the captain was not prevented by the capture from taking in a full cargo purchased, and lying alongside of the vessel when the seizure was made; and this was done with the permission of the captor.

Hare, Ingersoll & Tilghman, for plaintiff.
Rawle & Lewis, for defendant.

Washington, Circuit Justice, asked the plaintiff's counsel, if the relation back of the property to the capture by the abandonment, did not furnish an argument against the claim of the plaintiff to an indemnity for the cargo taken in after the capture?

WASHINGTON, Circuit Justice (charging jury). This is a case of some difficulty, and of considerable interest. It deserved and has received an able discussion at the bar, and a patient examination by the court and jury. Thinking that the cause must turn entirely upon the warranty, we will at once clear it of the other subjects which have been presented to our consideration. It has been in-

sisted, that the policy was avoided by a deviation from the voyage insured. This point is not to be maintained. The words of the policy are plain, general, and unqualified. The places at which this vessel was to take in her load, are stated to be in Honduras. All parties knew that this expression comprehended the whole of the Spanish possessions on the Bay of Honduras, as well as the small portion on the bay possessed by the British. Had they intended to confine it to that part, nothing could have been more easy or more natural, than to have inserted words to express such intention. There is nothing on the face of instrument itself, or in the evidence, which can warrant the position, that they meant differently from what their language declares; and it would be a dangerous experiment, in such a case, to leave a certain and safe guide, with which the language of the parties furnishes us, to wander in the unsatisfactory field of conjecture, as to their probable meaning. No aid can be drawn from the situation of the plaintiff, or from that of his country, in relation to Spain. Though a resident in the British settlement, it did not follow that if others took wood from the Spanish port, he should not do so: and indeed it appears, that it was common for vessels to fall down from the Bellize, and to take in their mahogany at Golden River, or Rio Grande, as was done in this case. This custom, if it is sufficiently proved to your satisfaction, ought to have been known to all parties, and not being excepted against, affords a strong reason for believing that they did not mean to restrict the places of loading.

The next question is, has the warrant been complied with? It struck the court during the trial, and we have hinted it to the bar, that this might probably be objected to as an illicit trade, being repugnant to a general principle of English law, if carried on by a British subject, with a dependency of Spain during war, or repugnant to the treaties between England and Spain, if it took place during a time of peace; for, as war was declared on the 11th of January, 1805, and she took in part of her load before, and part after that period, it might be well to consider the relative situation of the two countries at those periods. But, upon reflection, there does not appear to be much weight in those objections. There was in fact no trading with the Spanish part of Honduras; but the wood was cut and taken, so far under the authority of the superintendent of the English settlement, that wood-cutters and sworn measurers were sent down with the vessels. If then the wood was taken in time of peace, it was permitted by an article of the convention of 1786, when wood should become scarce in the British settlement; and as it appears by the evidence, that the Concord did no more than had been practised before, it is fair to presume that the event had taken place on which this right might be exercised,

and that it was tolerated on the part of Spain. And this is in no small degree strengthened by the circumstance mentioned at the bar, that this conduct of the British settlers is not to be found in the list of complaints, set forth in the manifesto issued by Spain, on the breaking out of the war. If, on the other hand, the wood was taken during the war, it was no more than the exercise of a belligerent right, and therefore not within the words of this warranty.

We come now to the point of real difficulty. Was the trade in which the vessel was concerned, prohibited by any regulations of the British government, or of this settlement at Honduras? To get regularly at this question it will be necessary to settle what is the true meaning of the engagement, which, by this warranty, the assured takes upon himself. We think it quite clear, that he takes upon himself the risk of losses which arise from illicit or prohibited trade, and seizure or detention made or caused on that account. An illicit trade, unaccompanied by a seizure, or an unfounded seizure for a supposed illicit trade, where none took place, will not affect his right to indemnity. The clause respecting illicit trade, varies in different policies. In Church v. Hubbart [2 Cranch (6 U. S.) 188], the warranty was against seizures by the Portuguese for illicit trade with them. In this, it is more general; but in both, the two circumstances of seizure and illicit trade must concur. In the general plunder of neutral commerce, which has taken place during the late and present wars, where seizures have been made upon the most frivolous pretences, no person wishing to be protected by a policy, would be satisfied with an indemnity to depend upon the fact of a seizure for the alleged cause of being engaged in a prohibited trade, if in fact the trade was fair; and though it should be illegal, still, if this was not the cause of the loss, there can be no good reason why the insurer might not agree to indemnify. In this case, however, the Concord was seized and detained on account of a prohibited trade, and the question will be, was the trade prohibited? Upon what footing did this trade stand, at the time when the proclamation of the 14th of July was issued? So far as we can judge from the evidence laid before us, no vessel, either foreign or British, could export mahogany more than seventeen inches in diameter to the United States, though it might be exported of any size, and in any vessel, to Great Britain. The recital of his majesty's instructions in the first proclamation, must be considered as evidence of the first part of this position; and the latter seems to result from the following considerations. It may, in the first place, be presumed, because no regulation to the contrary, either by act of parliament, instructions from the king, or regulations of the superintendent, has been even stated; and it is admitted that the navigation laws of England do not ex-

tend to this settlement. Secondly; this distinction between the exportation of mahogany to England and to other countries, seems to be perfectly consistent with a sound policy, and particularly with the policy of England, a manufacturing nation. For, though she would, in order to give a preference to her own manufactories, permit only wood of an inferior quality to be exported to the United States, she would, for the same reason, encourage that of a large size to be sent to Great Britain, without regarding the character of the vessel in which it was brought; unless, indeed, it had been prohibited altogether in foreign vessels, which was not the case.

But, thirdly, we have the declaration of many witnesses, who have long resided in that settlement, that they never knew or had heard of any law or regulation, which made a difference between foreign and British vessels exporting mahogany to England; and that if any such had existed, they must, from their situations, have known it. This evidence is very strong indeed, and, being unopposed, seems to warrant us in believing, that the exportation of mahogany of any size was permitted in any vessel, if carried to England. But there was an express prohibition to carry mahogany, exceeding seventeen inches, in any vessel, to the United States. This, by the by, proves that it was not the character of the vessel, but the place to which the wood was carried, which entered into the policy of the government on this subject. This being the state of the trade in July, 1804, the superintendent, on the 14th of that month, issued his proclamation, and in opposition to his instructions, permitted the exportation of mahogany, not exceeding twenty inches, in any vessel of the United States. On the 11th of October, 1804, he issues his second proclamation, misreciting the purport of the first, as if it had extended only to foreign vessels, going with wood to any part of the world; and stating the disapprobation of his government of the permission granted by that proclamation, he forbids the exportation of mahogany, above seventeen inches, from that settlement, generally; without confining the exportation to any particular place. It is the generality of the expressions in this proclamation, which creates difficulty in the cause. It must be admitted, that, taking the words literally, they comprehend an exportation in a foreign vessel to England, as well as to the United States; and the question is, whether the instrument ought, upon legal and rational principles, to be so construed. The difficulty is increased by the misrecital of the first proclamation, so as to induce an argument that it was not the proclamation, but the recited permission, which was disapproved. But there are nevertheless, the strongest reasons to conclude, that the reference was intended to be the proclamation. The date of the first proclamation is correctly stated,

and it does not appear that any other of that date, or indeed of any prior date, had been issued respecting this trade. It is, therefore, rather to be presumed, that he mistook the purport of that proclamation, than that he had in view any other permission granted by him, except what that proclamation contained. The second professes to recite the first, and by stating the disapprobation which the first had received, it affords the true cause for making the second. If the latter be construed as going no farther than to repeal the former, it will reach exactly as far as the mischief, and no farther. If it be taken literally, it will go beyond the mischief, without an apparent cause for it, as well as against the policy of the British government, in respect to this trade. Besides, a literal construction will have the effect to set up the proclamation, and to make it paramount to the existing law of the settlement; which, as has been stated before, tolerated the exportation of mahogany of any size, and in any vessel, to Great Britain; whereas the words used would interdict such exportation in foreign vessels.

Another strong reason against the construction was mentioned at the bar, viz., that the bond, which was directed to be given under the first proclamation, was conditioned that the mahogany should not exceed twenty inches, permitted by the proclamation to be exported to the United States; but no stipulation in it extended to mahogany of any size, if exported to England. On the other hand, the bond actually given by the plaintiff in this case, is silent as to the size of the wood, but contains an express obligation that the wood is to be exported to Liverpool, and shall not be landed in the United States; thus showing the sense of the government as to the policy, as well as to the true import of the regulations on this subject. Upon the whole, then, it seems to us, that the second proclamation does not make this exportation illicit, and of course that the warranty has not been violated.

As there is some little diversity of opinion in the court respecting the third point, and it is of no great consequence as to the value, that point will be left to the jury.

In the opening, on the part of the plaintiff, his counsel offered a bill of lading, signed by the captain on the fifteenth of February, 1805, eighteen days after the capture, but before the loss, and before the vessel left Honduras. This was objected to. The court admitted it to go to the jury, observing that though, according to the regular course of doing business, the bill of lading is given on taking in the cargo, and in general, if given so long after, as in this case, would create a suspicion of fraud, so as to invalidate it; yet, that if a fair reason can be assigned, there can be no ground for a charge of fraud. Such a reason appears in this case. The capture having taken place whilst the vessel was

taking in her load, it could not be given in a regular way. The handwriting of the captain is proved, and as there is not such a ground in law, to induce a suspicion that it was made to serve a purpose, it ought to go to the jury, and the credit due to the paper to be left to them. Afterwards the invoice, bearing date the 17th of February, was offered, and objected to. It appeared that the paper was enclosed by the plaintiff to his correspondent in this city, in a letter dated the 20th of February, 1805. It was argued in support of the objection, that it ought to be proved to agree with the entries in the plaintiff's books; or by some person, that the value is truly stated.

BY THE COURT. According to the general rules of law in other cases, an invoice by itself, would be inadmissible; and we cannot admit that its accordance with entries in the plaintiff's books, would be sufficient to make it evidence within these rules. But in commercial cases, it is uniformly admitted, if it carries with it the proof of its fairness: it is not known to have ever before been questioned. It is prima facie evidence of value, and no more. Like the bill of lading, it is regularly made out, when the cargo is completed; but it could not be in this case, any more than the bills of lading, since the capture was made whilst the vessel was loading, and that too at a considerable distance from the Bellize. It came to the agent of the plaintiff, in a letter dated after the capture, but before the vessel had sailed from Honduras. This also ought to be left to the jury.

Verdict for plaintiff.